## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LOUISIANA ENVIRONMENTAL ACTION NETWORK<br>P.O. Box 66323<br>Baton Rouge, LA 70896;<br><br>PEOPLE CONCERNED ABOUT CHEMICAL SAFETY<br>P.O. Box 11034<br>Charleston, WV 25339; *and*<br><br>SIERRA CLUB<br>2101 Webster St., Suite 1300<br>Oakland, CA 94612,<br><br>               *Plaintiffs*,<br><br>    v.<br><br>MICHAEL S. REGAN, Administrator,<br>U.S. Environmental Protection Agency, in his official capacity,<br>1200 Pennsylvania Ave., NW<br>Washington, DC 20460,<br><br>               *Defendant*. | Civil Action No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      This is a suit to compel the Administrator of the United States Environmental Protection Agency ("EPA") to take actions mandated by the Clean Air Act, 42 U.S.C. §§ 7401-7671q, to protect public health and the environment from industrial sources of air pollution. EPA has failed to perform its nondiscretionary duties under section 112(d)(6) of the Clean Air Act ("the Act") to review air emission standards for Polyether Polyols Production and to take final action either to revise the standards or determine that no revision is necessary. Thus, EPA is in ongoing violation of the Act. This complaint seeks to compel these overdue reviews and rulemakings for the Polyether Polyols Production source category regulated under the National Emission Standards for Hazardous Air Pollutants ("NESHAP"), 40 C.F.R. Part 63, Subpart PPP.

2.      Polyether Polyols Production facilities are major sources of pollution. These sources emit highly hazardous air pollutants, including carcinogens like ethylene oxide.

3.      While EPA has failed to act, the COVID-19 pandemic has worsened the harm for communities where air pollution has increased mortality.[1] Communities exposed to these Polyether Polyols Production emissions, who are disproportionately communities of color and low-income, need EPA to fulfill its overdue legal obligations to review and revise the emission standards applicable to these facilities, in order to help improve the air they breathe.

4.      In particular, section 112(d)(6) of the Clean Air Act requires the Administrator to "review, and revise as necessary" emission standards for hazardous air pollutants in listed categories at least every eight years after promulgating standards under section 112. 42 U.S.C. § 7412(d)(6). Section 112(f)(2) requires the Administrator to review the health and environmental risks that remain under the existing standards, and to promulgate standards that protect public health and the environment (or promulgate a determination that such standards are not required) within eight years after the promulgation of standards under section 112(d).

5.      More than eight years have passed since EPA's last section 112(d)(6) review of the NESHAP for the Polyether Polyols Production source category, yet the agency has not reviewed and revised such standards, nor has it promulgated a determination that no such revisions are necessary, as required under section 112(d)(6). 42 U.S.C. § 7412(f)(2). Due to the Defendant Administrator's failures to act appropriately to control Polyether Polyols Production sources' toxic air emissions, Plaintiffs Louisiana Environmental Action Network, People Concerned About Chemical Safety, and Sierra Club (collectively, "Plaintiffs") seek both a

---

[1] *See, e.g.*, Michael Petroni et al., *Hazardous Air Pollutant Exposure as a Contributing Factor to COVID-19 Mortality in the United States*, 15 Envtl. Res. Lett., Sept. 2020, https://iopscience.iop.org/article/10.1088/1748-9326/abaf86.

determination that the Defendant Administrator's failures to perform an action required by 42 U.S.C. § 7412(d)(6) violate the Clean Air Act, and an order to compel the Administrator to take the required action in accordance with an expeditious deadline set by this Court.

## JURISDICTION AND VENUE

6. This action arises under the Clean Air Act. 42 U.S.C. § 7412(d)(6).

7. This Court has jurisdiction over this action pursuant to 42 U.S.C. § 7604(a)(2) and 28 U.S.C. §§ 1331 and 1361.

8. This Court may order the Administrator to perform the requisite acts and duties, may issue a declaratory judgment, and may grant further relief pursuant to 42 U.S.C. § 7604(a), the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and 28 U.S.C. § 1361.

9. Plaintiffs have a right to bring this action pursuant to the Clean Air Act, 42 U.S.C. § 7604(a)(2), 28 U.S.C. § 1361, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

10. By certified letter to the Administrator mailed on May 31, 2023, Plaintiffs gave notice of this action as required by 42 U.S.C. § 7604(b)(2) and 40 C.F.R. § 54.2(d).

11. As sixty days have passed since this submission, Plaintiffs have satisfied the notice requirements in 42 U.S.C. § 7604(b)(2).

12. Venue is vested in this Court under 28 U.S.C. § 1391(e) because the Defendant, EPA Administrator Michael S. Regan, resides in this district.

**PARTIES**

13.     Plaintiff Louisiana Environmental Action Network ("LEAN") is a nonprofit organization based in Louisiana. LEAN is an environmental justice network of community members that advocate for environmental justice and protection from toxic pollution in the State of Louisiana. Through public education, advocacy, and community organizing, LEAN aims to empower individuals and communities to be more informed about the environmental impacts of industry and development and to use the tools available to them to protect human health and the environment through public engagement.

14.     Plaintiff People Concerned About Chemical Safety ("PCACS") is a volunteer-based grassroots organization in the Kanawha Valley of West Virginia. PCACS is dedicated to the protection of health and safety of all who reside, work, and study in the vicinity of local chemical plants. PCACS serves as a watchdog to hold companies accountable and to uphold environmental and chemical safety regulations through education, community organizing, and advocacy within the Kanawha Valley community.

15.     Plaintiff Sierra Club is a nonprofit corporation with its headquarters located in Oakland, California. The Sierra Club is a national membership organization whose mission is to explore, enjoy, and protect the planet; to practice and promote the responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out those objectives. As such, Sierra Club is dedicated to the protection of public health and the environment, and regularly advocates for policies that protect air quality. It has 64 chapters and more than 780,000 members who reside in all 50 states, the District of Columbia, and Puerto Rico.

4

16.     Defendant Michael S. Regan is the Administrator of the EPA. In that role, he is charged with the duty to uphold the Clean Air Act and to take required regulatory actions according to the schedules established therein. *See* 42 U.S.C. § 7601.

## LEGAL FRAMEWORK

17.     The Clean Air Act's purpose is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). A "primary goal" of the Act is "pollution prevention." *Id.* § 7401(c). Congress enacted this law in part because "the growth in the amount and complexity of air pollution brought about by urbanization, industrial development, and the increasing use of motor vehicles, has resulted in mounting dangers to the public health and welfare." *Id.* § 7401(a)(2).

18.     In the 1990 Clean Air Act Amendments, Congress strengthened section 112 and established new requirements for EPA to control toxic air pollution. By statute, Congress listed 189 air pollutants that it determined to be "hazardous" for regulation and required EPA to list any other compounds "known to cause or [that] may reasonably be anticipated to cause adverse effects to human health or adverse environmental effects." *Id.* § 7412(b)(1), (b)(3)(B); *see also id.* § 7412(a)(6); § 7602(g).

19.     The Act requires EPA to list categories of sources of all hazardous air pollutants. 42 U.S.C. § 7412(c)(1). According to deadlines provided in the Act, EPA must then promulgate emission standards for each listed category or subcategory of such major and area sources of hazardous air pollutants. *Id.* § 7412(d). The standards for major sources, often referred to as "maximum achievable control technology" or "MACT" standards, must require "the maximum degree of reduction in emissions of . . . hazardous air pollutants . . . [that] is achievable . . . ." *Id.*

§ 7412(d)(2). The floor, or minimum stringency required of such standards must reflect what the best controlled source or sources have "achieved." *Id.* § 7412(d)(3).

20.     Once the Administrator has promulgated emission standards pursuant to section 112(d) for a source category, EPA must ensure that such standards continue to strengthen over time. First, "[t]he Administrator shall review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards promulgated under this section no less often than every [eight] years." *Id.* § 7412(d)(6).

21.     In addition to revising standards to reflect control "developments," EPA must make all revisions that are "necessary" to bring standards into full compliance with the Clean Air Act, *id.*, such as "impos[ing] appropriate limits . . . on all the toxics the source category emits" or otherwise revising "any underinclusive emission standards." *See La. Env't. Action Network v. EPA*, 955 F.3d 1088, 1097, 1099 (D.C. Cir. 2020); *Sierra Club v. EPA*, 551 F.3d 1019 (D.C. Cir. 2008).

22.     If the Administrator finds that no such revisions are "necessary," he must issue a final determination as to that fact. 42 U.S.C. § 7412(d)(6).

23.     Section 112(d) standards become effective "upon promulgation." *See id.* § 7412(d)(10); *see also id.* § 7412(i) (setting compliance schedule for section 112(d) standards).

## FACTS

### Overdue EPA Nondiscretionary Duties Under 42 U.S.C. § 7412 (d)(6)

24.     EPA listed the Polyether Polyols Production source category as a major source of hazardous air pollutants in 1992. *See* EPA, Initial List of Categories of Sources Under Section 112(c)(1) of the Clean Air Act Amendments of 1990, 57 Fed. Reg. 31,576 (July 16, 1992).

6

25.     As of 2012, EPA has estimated that Polyether Polyols Production facilities emit 269 tons per year of hazardous air pollutants.[2] EPA has recognized that these emissions include organic hazardous air pollutants such as ethylene oxide, ethylene glycol, and propylene oxide, and dozens of other hazardous air pollutants.[3]

26.     EPA first promulgated the NESHAP for the Polyether Polyols Production source category under section 112(d) of the Clean Air Act on June 1, 1999. *See* 40 C.F.R. Part 63, Subpart PPP; Final Rule, 64 Fed. Reg. 29,420 (June 1, 1999); Proposed Rule, 62 Fed. Reg. 46,804 (Sep. 4, 1997). These standards apply to manufacturers of polyether polyols that are major sources of hazardous air pollutant emissions.

27.     On March 27, 2014, EPA promulgated updated NESHAP standards and conducted a "residual risk and technology review" under sections 112(d)(6) and 112(f)(2) of the Clean Air Act for the Polyether Polyols Production source category. *See* 2014 NESHAP Rule, 79 Fed. Reg. at 17,341.

28.     While EPA "determined that no rule amendments [were] needed based on" the risk review, EPA decided to revise the Polyether Polyols Production emission standards in three areas, specifically by: (i) removing exemptions during periods of startup, shutdown, and malfunction ("SSM") and adding provisions to provide an affirmative defense to civil penalties for violations of emission standards caused by malfunctions; (ii) requiring electronic reporting of performance test results; and (iii) requiring monitoring of pressure relief devices in organic hazardous air pollutant service that release to the atmosphere. *Id.*

---

[2] National Emission Standards for Hazardous Air Pollutants Emissions: Group IV Polymers and Resins; Pesticide Active Ingredient Production; and Polyether Polyols Production, 77 Fed. Reg. 1268, 1275 (proposed Jan. 9, 2012).
[3] *Id.*

29.     In compliance with section 112(d)(6), the Administrator was required to "review, and revise as necessary" the 2014 NESHAP rule for the Polyether Polyols Production source category no later than March 27, 2022, *i.e.*, within eight years.

30.     The Administrator has not conducted the required review of the 2014 NESHAP rule and promulgation of all necessary revisions—or made a determination that no revisions are necessary—by March 27, 2022, or at any time since then, as of the date of this complaint.

31.     Therefore, the Administrator has violated and is in ongoing violation of his statutory duty under section 112(d)(6) for the Polyether Polyols Production source category.

**Petition for Reconsideration**

32.     On May 27, 2014, community and environmental organizations, including two of the undersigned Plaintiffs, filed a petition for reconsideration of certain aspects of the 2014 NESHAP rule.

33.     The reconsideration petition sought to rectify a number of serious flaws in the 2014 NESHAP rule pursuant to 42 U.S.C. § 7607(d)(7)(B), including EPA's failure to require electronic indicators and alarms to provide immediate notice of releases from pressure relief devices, the illegal addition of an affirmative defense to civil penalties for violations of emission standards that are caused by malfunctions, and EPA's failure to consider new health risk and pollution control information and to assure an ample margin of safety to protect public health.

34.     On August 26, 2014, EPA sent a letter to petitioners "grant[ing] reconsideration of the final rule on petitioners' request that the EPA remove the affirmative defense provision from the rule in light of the court opinion in *Natural Resources Defense Council v. EPA*, 749 F.3d 1055 (D.C. Cir. April 18, 2014) and petitioners' request that the EPA reconsider the

requirements associated with emissions from pressure relief devices."[4] The letter stated that EPA would "continu[e] to review the other issues raised" in the petition for reconsideration, but provided no date by which final action would be taken.[5]

35.     EPA has thus far taken no further action pursuant to this reconsideration process, which ostensibly remains ongoing to this day.

36.     EPA's delay on completing final action on reconsideration has delayed litigation of the 2014 NESHAP rule, as the court and petitioners in D.C. Circuit Case No. 14-1083 are waiting on EPA to complete final action to determine whether litigation on any or all pending issues with the 2014 NESHAP rule is needed or whether the reconsideration process will resolve those matters.[6]

37.     EPA has delayed completing final action on reconsideration for over nine years.

**EPA's Office of the Inspector General 2021 Report**

38.     On May 6, 2021, EPA's Office of the Inspector General ("OIG") issued a final report on ethylene oxide-emitting source categories, including Polyether Polyols Production.[7]

39.     The OIG report urged EPA to fulfill its overdue duty to complete new risk and technology reviews that would protect "people in some areas of the country" from "unacceptable risks" from ethylene oxide emissions.[8] The OIG's report further noted that "[i]n the absence of

---

[4] *See* Letter from Janet McCabe, EPA, to Emma Cheuse, Earthjustice (Aug. 26, 2014).

[5] Letter from Janet McCabe, *supra* note 4.

[6] EPA Status Report, Case No. 14-1083 (March 8, 2023).

[7] U.S. Env't Prot. Agency, Off. of the Inspector Gen., Report No. 21-P-0129, EPA Should Conduct New Residual Risk and Technology Reviews for Chloroprene- and Ethylene Oxide-Emitting Source Categories to Protect Human Health (2021), https://www.epa.gov/sites/default/files/2021-05/documents/_epaoig_20210506-21-p-0129.pdf [hereinafter OIG Report].

[8] *Id.* at 14.

updated reviews for the applicable source categories, the Agency cannot provide assurance that its current NESHAPs are protective" of public health.[9]

40.    The OIG report found that EPA was failing to meet its statutory deadlines for conducting technology reviews, and urged EPA to conduct a review for Polyether Polyols Production before the March 2022 deadline. The OIG specifically noted that "[t]he [Clean Air Act] does not provide any exceptions for this requirement."[10]

41.    On March 5, 2021, EPA's Office of Air and Radiation responded to the draft OIG report and proposed corrective actions to address the OIG's recommendations.[11]

42.    In its March 5, 2021, response to the OIG, EPA stated that it would conduct the required technology review for the Polyether Polyols Production source category, and "will determine whether the Agency should conduct a discretionary residual risk review during the rulemaking" based on the updated ethylene oxide toxicity information.[12]

43.    In its March 5, 2021, response to the OIG, EPA also provided a "Planned Completion Date" of Quarter 4, FY 2024 for completing reviews of the Polyether Polyols Production source category.[13] In a subsequent response letter dated June 1, 2022, EPA also committed to conduct a new risk review of the Polyether Polyols Production source category by the same Quarter 4, FY 2024 Planned Completion Date.[14]

---

[9] *Id.* at 21.

[10] *Id.* at 24.

[11] *Id.*, App,. at 34-37.

[12] *Id.*, App., at 35-36.

[13] *Id.*, App., at 36.

[14] *See* EPA, EPA Response #3 to Final Report: "EPA Should Conduct New Residual Risk and Technology Reviews for Chloroprene- and Ethylene Oxide-Emitting Source Categories to Protect Human Health" – Report No. 21-P-0129, May 6, 2021, at 3-5 (June 1, 2022),

## Health Effects of Polyether Polyols Production Emissions

44.     In the 2014 NESHAP rulemaking, EPA identified 23 Polyether Polyols Production facilities regulated under Subpart PPP, with one document putting the number at 25 sources.[15]

45.     According to EPA's Enforcement and Compliance History Online (ECHO) database, there are 30 Polyether Polyols Production facilities regulated under Subpart PPP, 29 of which are major sources, as of the date of this complaint.[16]

46.     For the Polyether Polyols Production source category, there are currently five regulated emission points: continuous and batch process vents which allow emissions to pass through from combustion, recovery, recapture devices, condensers, distillation units, and reactors; storage vessels that contain one or more organic hazardous air pollutants; process and maintenance wastewater streams; equipment leaks from ancillary equipment and compressors

---

https://www.epa.gov/system/files/documents/2022-06/_epaoig_21-P-0129_Agency_Response2.pdf [hereinafter EPA Response #3].

[15] *See* 79 Fed. Reg. at 17,361 ("We estimate 23 regulated facilities are currently subject to 40 CFR part 63, subpart PPP."); EPA, ICR Supporting Statement for Polyether Polyols Production, Document No. EPA-HQ-OAR-2011-0435-0010, at 2 ("The polyether polyols universe consists of 23 existing facilities that would be subject to the major source provisions specified under subpart PPP."), *available at* https://www.regulations.gov/document/EPA-HQ-OAR-2011-0435-0010; EPA, Final Economic Impact Analysis for the Proposed Chemical Sector NESHAPs, Document No. EPA-HQ-OAR-2011-0435-0002, at 7 (Nov. 2011) ("We identified 25 currently operating facilities subject to the PEPO MACT standard."), *available at* https://www.regulations.gov/document/EPA-HQ-OAR-2011-0435-0002.

[16] Lists created by searching EPA's ECHO website for sources regulated under MACT Subpart PPP and narrowing the search to those facilities listed as major sources. *See* EPA, Enforcement and Compliance History Online (ECHO), https://echo.epa.gov/ [hereinafter Enforcement and Compliance History].

intended to operate in organic hazardous air pollutant service; and heat exchange systems used to cool process equipment.[17]

47.     Polyether Polyols Production facilities emit harmful compounds including organic hazardous air pollutants such as ethylene oxide, propylene oxide, hexane, and toluene.[18]

48.     Ethylene oxide is a human carcinogen that can specifically cause lymphoma and breast cancer through inhalation.[19] The National Toxicology Program, International Agency for Research on Cancer, and the Occupational Safety and Health Administration, have also concluded that ethylene oxide is carcinogenic to humans.[20]

49.     Individuals who live near facilities where ethylene oxide is released, such as Polyether Polyols Production facilities, are at risk of exposure, and individuals who work in those facilities have an even higher-than-average risk of exposure at higher amounts of ethylene

---

[17] U.S. Env't Prot. Agency, EPA-456/R-00-002, Implementation Document for the Polyether Polyols Production NESHAP (40 C.F.R. 63, Subpart PPP) 44-101 (2000).

[18] EPA, *Polyether Polyols Production: National Emission Standards for Hazardous Air Pollutants (NESHAP)*, EPA, https://www.epa.gov/stationary-sources-air-pollution/polyether-polyols-production-national-emission-standards-hazardous (last updated July 13, 2023).

[19] See U.S. Env't Prot. Agency, EPA/635/R-16/350Fc, Evaluation of the Inhalation Carcinogenicity of Ethylene Oxide, Executive Summary, In Support of Summary Information on the Integrated Risk Information System (IRIS) 2 (2016), https://cfpub.epa.gov/ncea/iris/iris_documents/documents/subst/1025_summary.pdf [hereinafter IRIS Summary].

[20] Nat'l Toxicology Program, *Report on Carcinogens, Ethylene Oxide* 1 (5th ed. 2021), https://ntp.niehs.nih.gov/ntp/roc/content/profiles/ethyleneoxide.pdf; Int'l Agency for Rsch. on Cancer, *IARC Monographs 100F Ethylene Oxide* 395 (2012), https://monographs.iarc.fr/wp-content/uploads/2018/06/mono100F-28.pdf; Occupational Safety and Health Admin., *OSHA Fact Sheet Ethylene Oxide* 1 (2002), https://www.osha.gov/sites/default/files/publications/ethylene-oxide-factsheet.pdf.

oxide.[21] Ethylene oxide may also pose risks to animals near ethylene oxide-emitting facilities, damaging land ecosystems.[22]

50.     In 2016, EPA determined that ethylene oxide's unit risk assessment is nearly 60 times greater than previously understood, with a greater risk posed to children whose cells divide more frequently than adults.[23] Prenatal exposure to carcinogens and other air pollutants and exposure during early childhood increase an individual's lifetime cancer risk and other health risks due to greater vulnerability to harm from pollution during early stages of development.[24]

51.     Based on 2014 National Air Toxics Assessment data from 2014, EPA OIG concluded that more than 472,000 people lived where "the individual lifetime cancer risk was equal to or greater than 100 in one million" driven primarily by exposure to ethylene oxide.[25]

52.     Inhalation of ethylene oxide emitted from Polyether Polyols Production sources can also cause other kinds of chronic, long-term harm, such as respiratory issues, damage to and degradation of the nervous system and brain, and potentially reproductive and developmental

---

[21] EPA, *Our Current Understanding of Ethylene Oxide (EtO)*, EPA (Apr. 11, 2023), https://www.epa.gov/hazardous-air-pollutants-ethylene-oxide/our-current-understanding-ethylene-oxide-eto#risks [hereinafter *Current Understanding*].

[22] Id.

[23] EPA established a cancer risk factor for EtO of $3.0 \times 10^{-3}$ per µg/m3 for adult exposure, or $5.0 \times 10^{-3}$ per µg/m3 over a lifetime, accounting for increased vulnerability from early-life exposure. IRIS Summary, *supra* note 19, at 2; *see also,* EPA, *Additional Questions about Ethylene Oxide (EtO)*, EPA (Apr. 11, 2023), https://www.epa.gov/hazardous-air-pollutants-ethylene-oxide/frequent-questions-about-ethylene-oxide-eto.

[24] *See* IRIS Summary, *supra* note 19 at 2.

[25] OIG Report, *supra* note 7, at 4-5.

harms.[26] Short-term inhalation of high amounts of ethylene oxide can cause nausea, headaches, dizziness, respiratory irritation, vomiting, and fatigue.[27]

53.     EPA has long recognized that carcinogens have no safe level of human exposure and that cancer risk is additive.

54.     Socioeconomic disparities and related stressors increase vulnerability to carcinogenic and other toxic exposures.

55.     Many Polyether Polyols Production facilities are concentrated in communities that are overburdened by industrial development, such as West Virginia's "Chemical Valley" located along the Kanawha River west of Charleston.[28] Institute, a town in the heart of Chemical Valley, is one of only two majority-Black communities in West Virginia and is home to several Polyether Polyols Production facilities that emit ethylene oxide.[29]

56.     The Union Carbide facility in Institute contributes to an increased cancer risk to the surrounding community that is thirty-six times the level EPA considers acceptable due to hazardous air pollutants, and is ranked the 17th worst for risk of developing cancer out of 7,600 facilities around the country.[30]

---

[26] U.S. Dep't of Health and Hum. Serv., Agency for Toxic Substance and Disease Registry, *Toxicological Profile for Ethylene Oxide* 2-7 (2022), https://www.atsdr.cdc.gov/toxprofiles/tp137.pdf.

[27] *Current Understanding*, *supra* note 21.

[28] Ken Ward, *How Black Communities Become 'Sacrifice Zones' for Industrial Air Pollution'*, WV Public Broadcasting (Dec. 22, 2021), https://wvpublic.org/how-black-communities-become-sacrifice-zones-for-industrial-air-pollution/.

[29] *Id.*

[30] *See id.*; *see also* Al Shaw & Lylla Younes, *The Most Detailed Map of Cancer-Causing Industrial Air Pollution in the U.S.*, ProPublica (Nov. 2, 2021), https://projects.propublica.org/toxmap/#location/-81.7735/38.3801.

57.     Other clusters of Polyether Polyols Production facilities are found in "Cancer Alley" along the Mississippi River between Baton Rouge and New Orleans, Louisiana, as well as around Houston, Texas.[31] Communities within "Cancer Alley" experience higher levels of hazardous air pollutants, like ethylene oxide, above-average poverty rates, and have an average annual cancer rate of 502 cases per 100,000 people, ranking in the top 5% nationally for cancer risk from hazardous air pollutants.[32]

### Revision Rulemakings

58.     The 2014 NESHAP rule for Polyether Polyols Production contains outdated provisions that EPA would likely be required to revise and strengthen in the overdue rulemakings. These revisions would likely lead to reductions in air pollution and the avoidance or reduction of exposure to such pollution for people living near Polyether Polyols Production sources.

59.     As part of its overdue section 112(d)(6) review and revision, EPA would be required to remove the affirmative defense to civil penalties for emissions exceedances during malfunctions, the creation of which the D.C. Circuit has held to be illegal. *See Nat. Res. Def. Council v. EPA*, 749 F.3d 1055, 1062-64 (D.C. Cir. 2014). The D.C. Circuit found that EPA exceeded its authority in providing an affirmative defense for emissions exceedances during malfunctions and that it is for the courts to determine whether a civil penalty is appropriate under section 304(a) and not the EPA. *See id.*; 42 U.S.C. § 7604(a). In fact, EPA has recently admitted

---

[31] Enforcement and Compliance History, *supra* note 16.

[32] Kimberly A. Terrell & Gianna St. Julien, Air Pollution is Linked to Higher Cancer Rates Among Black or Impoverished Communities in Louisiana, 17 Env't Rsch. Letters 1, 2 (2022); Tulane University, Tulane Study: Louisiana's Severe Air Pollution Linked to Dozens of Cancer Cases Each Year, Tulane (Jan. 13, 2022, 12:30 PM), https://law.tulane.edu/news/tulane-study-louisianas-severe-air-pollution-linked-dozens-cancer-cases-each-year.

its legal duty to remove the affirmative defense from similar source categories to Polyether Polyols Production.[33]

60.     EPA would also be required to set limits on all currently uncontrolled hazardous air pollutant emissions from the Polyether Polyols Production source category. *See La. Env't Action Network*, 955 F.3d at 1096 ("There is no dispute that the Act requires EPA to have in place emission standards to control *all* the listed pollutants that a source category emits, and requires the Agency to revise existing standards that are underinclusive to add section 112(d)(2)-(3) controls for listed but unaddressed pollutants.") (emphasis added).

61.     EPA's overdue section 112(d)(6) review must also "tak[e] into account developments in practices, processes, and control technologies," 42 U.S.C. § 7412(d)(6), such as fenceline monitoring – as EPA did for petroleum refineries[34] – as a way of complying with emission standards. *See* 42 U.S.C. § 7412(d)(6); *see also id.* § 7602(k). In fact, EPA recently published a proposed rule for related petrochemical source categories—including sources co-

---

[33] *See*, *e.g.*, New Source Performance Standards for the Synthetic Organic Chemical Manufacturing Industry and National Emission Standards for Hazardous Air Pollutants for the Synthetic Organic Chemical Manufacturing Industry and Group I & II Polymers and Resins Industry, 88 Fed. Reg. 25,080, 25,170 (Apr. 25, 2023) ("In light of *NRDC,* the EPA is proposing to remove all of the regulatory affirmative defense provisions from P&R I at 40 CFR 480(j)(4) in its entirety and all other rule text that references these provisions . . . .") [hereinafter New Source Performance Standards]; Consent Decree at 4, Cal. Cmty. Against Toxics v. EPA, No. 1:22-cv-01012-CRC (D.D.C. Apr. 17, 2023), ECF No. 21 (in which EPA agreed to address the affirmative defense provision for oil and gas source categories on or before December 10, 2024).

[34] In 2015, EPA determined there were developments in control technologies that required revisions to the Maximum Achievable Control Technology ("MACT") standards under section 112(d)(6) of the Act, particularly to require monitoring and corrective action for benzene at the fenceline of source facilities to assure compliance with the standards and improve control of fugitive emissions. *See* Final Rule, Petroleum Refinery Sector Risk and Technology Review and New Source Performance Standards, 80 Fed. Reg. 75,178 (Dec. 1, 2015).

located with Polyether Polyols Production sources—in which the agency proposed to require fenceline monitoring for sources emitting one of six hazardous air pollutants.[35]

62.     Further, EPA has acknowledged that flares "may" be used in the Polyether Polyols Production source category, but declined to update flare requirements as part of the 2014 NESHAP Rule.[36]

63.     Since the comment period for the 2014 NESHAP Rule closed, substantial new information has become available to support the need for reducing emissions from and ending routine use of flares, flare minimization, and monitoring requirements, as such EPA must revise the NESHAP to include strengthened flare standards for the Polyether Polyols Production source category.[37] For example, EPA should follow recent NESHAP rulemakings for other chemical and petrochemical source categories, which set out improved flare operational and monitoring requirements.[38]

---

[35] *See* New Source Performance Standards, *supra* note 33, at 25,086-87 (proposing to require fenceline monitoring for sources subject to the Hazardous Organic NESHAP and the Group I Polymers and Resins NESHAP).

[36] *See* Summary of Public Comments and Responses on Proposed Rule, Document No. EPA-HQ-OAR-2011-0435-0083, at 28 (Jan. 31, 2014), *available at* https://www.regulations.gov/document/EPA-HQ-OAR-2011-0435-0083.

[37] Flares are not achieving the requisite 98-percent destruction efficiency, but a far lower percentage that fails to assure compliance with the emission standards. *See, e.g.*, Memorandum from Andrew Bouchard to EPA, Dkt. ID No. EPA-HQ-OAR-2017-0357, Re: Control Option Impacts for Flares Located in the Ethylene Production Source Category, at 8 (March 2019), https://www.regulations.gov/document?D=EPA-HQ-OAR-2017-0357-0017.

[38] EPA has promulgated revised, stricter flare NESHAP standards for similar industries: petroleum refineries, miscellaneous organic chemical manufacturing, ethylene production, and organic liquids distribution facilities. *See, e.g.*, 80 Fed. Reg. 75,178 (revising petroleum refinery flare standards to ensure better combustion efficiency); National Emission Standards for Hazardous Air Pollutants: Organic Liquids Distribution (Non-Gasoline) Residual Risk and Technology Review, 85 Fed. Reg. 40,740 (July 7, 2020). EPA also recently proposed stricter operating and monitoring flare requirements for sources subject to the Hazardous Organic NESHAP and the Group I Polymers and Resins NESHAP. *See* 88 Fed. Reg. at 25,084, 25,086.

**ALLEGATIONS OF INJURY**

64.     Plaintiffs and their members are and will continue to be harmed by the Administrator's failures to take the actions required by 42 U.S.C. § 7412(d)(6) for the Polyether Polyols Production source category under 40 C.F.R. Part 63, Subpart PPP.

65.     Plaintiffs' members live, work, travel, recreate, attend school or educational programs, provide healthcare to family members, and engage in a variety of other activities near facilities in the source category. Plaintiffs' members suffer exposure and other harm to their health, recreational, aesthetic, educational, professional, and other interests due to breathing hazardous air pollutants emitted by facilities in the source category. Exposure to hazardous air pollutants emitted by sources in the source category has adverse health effects, which may include respiratory, neurological, developmental, and reproductive harm; damage to bodily organs and the central nervous system; cancer; and temporary and permanent disabilities, as well as other health effects described above.

66.     Plaintiffs' members are concerned that hazardous air pollutants are present in the locations where they live, work, travel, recreate, attend school or educational programs, provide healthcare to family members, and engage in other activities. These reasonable concerns about their increased exposure from such activities and other resulting harms from such exposure diminish their enjoyment of activities and areas they previously enjoyed or would like to continue to engage in or use, and thereby harm their recreational, aesthetic, educational, professional, and other interests.

67.     Plaintiff Sierra Club has over 35,000 members across Louisiana, Texas, and West Virginia, where Polyether Polyol Production facilities are particularly concentrated.

68.     Plaintiff Louisiana Environmental Action Network has members living near each of the six Polyether Polyol Production facilities in Louisiana.

69.     Plaintiff People Concerned About Chemical Safety has members living within a several miles of the Polyether Polyol Production facilities and related co-located facilities that dot the Kanawha Valley in West Virginia.

70.     For example, one of People Concerned About Chemical Safety's members lives in South Charleston, West Virginia. Her home of twenty years is roughly three miles from the Bayer MaterialScience and Union Carbide Corporation plants at 437 MacCorkle Avenue Southwest, South Charleston, West Virginia 25303, and less than four miles from the Union Carbide plants located at Route 25, Institute, West Virginia 24112. She previously lived within two miles of the Union Carbide plants in Institute. The member is concerned about her exposure to hazardous air pollutants coming from these facilities and the associated elevated risk of health harm. She suffers from an autoimmune disorder that manifested shortly after an explosion at what was then the Rhône-Poulenc plant in Institute. She believes she developed the disorder because of living near polluting facilities in Institute and experiencing numerous chemical exposures.

71.     In previous litigation concerning EPA's 2014 NESHAP rule, Plaintiffs' members have filed declarations demonstrating the specific harms they have suffered from Polyether Polyols Production facilities due to EPA's actions or inaction.[39] In compliance with this Circuit's requirements, Plaintiffs are prepared to file their members' declarations with their principal brief or in the event their standing is challenged.

---

[39] *See, e.g.*, Declarations of Pamela Nixon and Melanie Oldham, *Am. Chem. Council v. EPA*, Case No. 14-1083, Doc. No. 1499578 (D.C. Cir. June 26, 2014).

72.     Plaintiffs and their members suffer additional harm because they do not have up-to-date information, public safety advisories, published findings, or determinations from the Administrator regarding the emission limitations existing sources have achieved, the current pollution control methods, practices, and technologies that could be or are being used to achieve emission reductions, the health and environmental risks that remain under the existing standards, or other information relevant to the need for stronger emission and performance standards. This information would be provided to Plaintiffs, their members, and other interested members of the public were the Administrator to perform the required actions pursuant to section 112(d)(6). *See, e.g.*, 42 U.S.C. § 7607(d)(3)-(6) (describing notice and informational disclosures required as part of rulemakings under section 112).

73.     If Plaintiffs and their members had this information, they would use it to work for stronger health and environmental protections; to educate members, supporters, and the public pursuant to their organizational missions; and to protect themselves and their families from air pollutants and affected land, water, and food. The denial of this information impairs Plaintiffs' ability to provide information and services to their members to assist them in protecting their interests, hampers the ability of Plaintiffs and their members to take actions to protect their health and communities—including research and adoption of new mitigation and emergency preparedness measures—and diminishes their enjoyment of activities in their daily lives.

74.     Plaintiffs and their members suffer harm because they are denied the opportunity to present written comments, data, documentary information, views, and arguments to EPA and have them considered by the agency and responded to as part of the overdue section 112(d)(6) rulemaking. The Administrator's failures to conduct the overdue rulemakings have thus denied Plaintiffs and their members the opportunity to seek greater health protections and emissions

reductions—including the development of new mitigation and emergency preparedness provisions—and to have EPA consider and respond to such comments in taking the final actions required by section 112(d)(6). This deprivation of the opportunity to present comments and arguments and have them considered and addressed by EPA impairs Plaintiffs' and their members' ability to serve and protect their interests and fulfill their organizational missions.

75.    Plaintiffs and their members suffer harm because the Administrator has not issued final rules or determinations under section 112(d)(6) addressing and including all matters these provisions require, as discussed above. Any such rule or determination would be judicially reviewable. *See* 42 U.S.C. § 7607(b). Deprivation of the right to judicial review further harms the ability of Plaintiffs and their members to protect their interests and fulfill their organizational missions.

76.    The Administrator's failures to take actions required by section 112(d)(6) deprive Plaintiffs' members of the cleaner air that would result from those actions. Consequently, Defendant's violation of section 112(d)(6) prolongs and increases Plaintiffs' members' exposure to hazardous air pollutants and the related and resulting health, recreational, aesthetic, and other injuries as described above. Emission reductions required under section 112(d)(6) would reduce these exposures, and would reduce the related health, recreational, aesthetic, and other harms suffered by Plaintiffs' members.

77.    By not taking the actions required by section 112(d)(6), the Administrator deprives Plaintiffs and their members of information, published findings, and determinations, as described above. *See, e.g.*, *id.* § 7607(d)(3)-(6). In addition, the Administrator's failures to take the actions required by section 112(d)(6) deprive Plaintiffs and their members of the opportunity to receive judicial review of the lawfulness of the final EPA actions. *See id.* § 7607(b). These

failures make it more difficult for Plaintiffs and their members to seek health and environmental protections from air pollutants; to shield themselves, their families, and other community members from exposure to such pollutants; to protect their health, recreational, aesthetic, and other interests; and to be able to enjoy activities in their daily life without concerns about exposure to air pollutants. These failures also impair Plaintiffs' ability to provide educational services to their members concerning air pollution from Polyether Polyols Production sources and hinder Plaintiffs' ability to provide services and take actions vital to fulfilling their public health missions.

78.     For all of the foregoing reasons, the failures complained of herein cause Plaintiffs and their members and constituents injuries for which they have no adequate remedy at law. Granting the requested relief would redress these injuries.

## CLAIM FOR RELIEF

79.     The allegations of all foregoing paragraphs are hereby incorporated as if set forth fully herein.

### Violations of § 7412(d)(6) of the Clean Air Act

80.     Each of the Administrator's ongoing failures to review and to either revise or issue a determination not to revise the NESHAP regulating the Polyether Polyols Production source category under 40 C.F.R. Part 63, Subpart PPP, in accordance with 42 U.S.C. § 7412(d)(6), constitutes a "failure of the Administrator to perform any act or duty under this chapter which is not discretionary" within the meaning of section 304(a)(2) of the Clean Air Act.

81.     Each day the Administrator fails to take these legally required actions, Defendant commits new, additional, and ongoing violations of his duties under section 112(d)(6).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request, for the NESHAP regulating the Polyether Polyols Production source category, 40 C.F.R. Part 63, Subpart PPP, that the Court:

(1)     Declare that each of the Defendant Administrator's failures to review the emission standards and to either revise standards promulgated under section 112 or issue a final determination that such revision is not necessary under section 112(d)(6) for the Polyether Polyols Production source category within eight years, constitutes a "failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator" within the meaning of section 304(a)(2);

(2)     Order the Defendant Administrator to review the emission standards and to either revise them appropriately or issue a final determination that such revision is not necessary under section 112(d)(6) for the Polyether Polyols Production source category, in accordance with an expeditious deadline specified by this Court;

WHEREFORE, Plaintiffs respectfully request, for each of the above-listed obligations and rulemakings at issue in this case, that the Court retain jurisdiction to ensure compliance with this Court's decree, award Plaintiffs the costs of this action, including attorney's fees, and grant such other relief as the Court deems just and proper.

DATED:        September 18, 2023            Respectfully submitted,

*/s/ Adrienne Y. Lee*
Adrienne Y. Lee (D.C. Bar No. 1742666)
Adam Kron (D.C. Bar No. 992135)
EARTHJUSTICE
1001 G Street NW, Suite 1000
Washington, D.C. 20001
(202) 667-4500
akron@earthjustice.org
alee@earthjustice.org

*Counsel for Louisiana Environmental Action*
*Network, People Concerned About Chemical*
*Safety, and Sierra Club*